1
2
3
4
5
6
7
8
9

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

10   SEA SHEPHERD LEGAL,                     CASE NO. C19-0463JLR

11                         Plaintiff,        ORDER ON MOTION FOR
                                             SUMMARY JUDGMENT
           v.
12
     NATIONAL OCEANIC AND
13   ATMOSPHERIC
     ADMINISTRATION, et al.,
14
15                         Defendants.

16                    **I.      INTRODUCTION**

17         Before the court is Plaintiff Sea Shepherd Legal's ("SSL") motion for summary

18   judgment.  (MSJ (Dkt. # 43).)  Defendants National Oceanic and Atmospheric

19   Administration ("NOAA") and National Marine Fisheries Service ("NMFS")

20   (collectively, the "Government") oppose the motion.  (Resp. (Dkt. # 44).)  The court has

21   considered the motion, the parties' submissions in favor of and in opposition to the

22   //

ORDER - 1

1    motion, the relevant portions of the record, and the applicable law.  Being fully advised,[1]

2    the court GRANTS in part and DENIES in part SSL's motion for summary judgment.

## II.    BACKGROUND

4          SSL is a public interest organization dedicated to "sav[ing] marine wildlife and

5    habitats by enforcing, strengthening, and developing protective laws, treaties, policies

6    and practices worldwide."  (Compl. (Dkt. # 1) ¶ 17.)  SSL's two Freedom of Information

7    Act ("FOIA") requests underlying this suit concern the Māui dolphin, a critically

8    endangered species found off the west coast of New Zealand's North Island.  (*See*

9    Sommermeyer Decl. (Dkt. # 43-1) ¶¶ 2-3, Ex. 1 at 4, Ex. 2; Graff Decl. (Dkt. # 45) ¶ 10

10   n.1.)  Marine mammal bycatch—when a mammal is injured or killed as a result of getting

11   entangled in commercial fishing gear—has contributed to the Māui dolphin population

12   dwindling from approximately 2,000 in 1971 to around 50 in 2018, making the species

13   "the most endangered marine dolphin in the world."  (Sommermeyer Decl. ¶ 4, Ex. 3

14   ("Pet.") at 4.)  Studies reveal that fishing-related threats, especially the use of gillnets and

15   commercial trawling, may be dramatically increasing the risk of extinction.  (*Id.* at 4-5.)

16         NMFS is the federal agency responsible for implementing the Marine Mammal

17   Protection Act ("MMPA"), 16 U.S.C. §§ 1361 *et seq.*, which protects certain species of

18   marine mammals from threats including bycatch.[2]  (Compl. ¶ 19.)  To combat bycatch,

19   //

20

21         [1] No party requests oral argument (*see* MSJ at 1; Resp. at 1), and the court finds that oral
     argument would not be helpful to its disposition of the motion, *see* Local Rules W.D. Wash.
     LCR 7(b)(4).

22         [2] NOAA supervises NMFS and oversees FOIA requests made to NMFS.  (Compl. ¶ 20.)

the MMPA bans the importation of fish or fish products from foreign commercial fisheries that contribute to serious injury of marine mammals in excess of United States standards (the "Imports Provision").  16 U.S.C. § 1371(a)(2).

Under the Imports Provision, NMFS must evaluate foreign fisheries as well as foreign regulatory programs to determine whether their efforts to address bycatch are comparable in effectiveness to those in the United States.  (Graff Decl. ¶¶ 5-7); 50 C.F.R. §§ 216.1 *et seq.*  First, NMFS compiles an annual List of Foreign Fisheries detailing foreign fisheries' incidences of marine mammal bycatch.  (Graff Decl. ¶ 6.)  Second, NMFS evaluates whether foreign regulations are comparable to domestic standards.  (*Id.* ¶¶ 5, 7.)  Foreign nations have a five-year exemption period to develop their regulatory programs.  (*Id.* ¶¶ 7-8.)  During these five years, however, NMFS may consider emergency rulemaking to ban imports that have or are likely to have an "immediate and significant adverse impact" on marine mammals.  Fish and Fish Product Import Provisions of the Marine Mammal Protection Act, 81 Fed. Reg. 54389, 54395 (Aug. 15, 2016); 16 U.S.C. § 1387(g).

On December 21, 2018, SSL submitted its first FOIA request asking for records related to (1) the decision to list the Māui dolphin as endangered; (2) analysis of bycatch by New Zealand fisheries on the 2018 List of Foreign Fisheries; (3) communications with New Zealand officials in preparing the List of Foreign Fisheries; and (4) analysis of how the MMPA applies to relevant New Zealand fisheries.  (Sommermeyer Decl. ¶ 2, Ex. 1 at 1-2.)  SSL filed this instant suit on March 28, 2019, claiming that the Government had failed to timely and fully respond to the FOIA request.  (Compl. ¶¶ 38-50.)

While this first FOIA request was pending, SSL, along with two other Sea Shepherd entities, petitioned various agencies including the Government on February 6, 2019, for emergency rulemaking to immediately ban all products originating from New Zealand fisheries in the Māui dolphin's range that employ gillnets and trawling, pursuant to the MMPA and the Administrative Procedure Act ("APA"). (Pet. at 4.) NMFS denied the petition on June 18, 2019, and issued its notice of denial in the Federal Register on July 10, 2019. Notification of the Rejection of the Petition to Ban Imports, 84 Fed. Reg. 32853-01, 32853 (July 10, 2019). The agency reasoned that New Zealand had measures in place to reduce Māui dolphin bycatch and was implementing additional measures to achieve a comparable regulatory program. *Id.* at 32854-55.

SSL submitted a second FOIA request on July 15, 2019. (Sommermeyer Decl. ¶ 3, Ex. 2.) This second request sought similar categories of records that were "created or acquired" since the search cutoff date for the first request. (*Id.* at 1-2.) Additionally, it asked for documents related to NMFS's denial of SSL's petition. (*Id.*) SSL filed suit over this second FOIA request on September 16, 2019, and the court subsequently consolidated the two FOIA suits. (6/12/20 Order (Dkt. # 34) at 1-2.)

On May 21, 2020, SSL filed suit in the United States Court of International Trade ("CIT") asserting two claims: (1) the Government, along with other agencies, had violated the APA by failing to ban the import of products from New Zealand fisheries in the Māui dolphin's range, as required by the MMPA; and (2) the denial of SSL's petition for emergency rulemaking was arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with the MMPA. Compl. ¶¶ 84-94, *Sea Shepherd New*

1    *Zealand, et al. v. Wilbur Ross, et al.*, No. 20-cv-00112-GSK (Ct. Int'l Trade May 21,

2    2020).  SSL moved for a preliminary injunction on July 1, 2020, and the agency

3    defendants requested a voluntary remand so that NMFS could reconsider the petition in

4    light of new regulatory measures announced by New Zealand and New Zealand's request

5    for an early compatibility finding with respect to the Māui dolphin.  (Sommermeyer Decl.

6    ¶ 6, Ex. 4 ("Supp. Pet.") at 5; Graff Decl. ¶ 17.)  The CIT granted the voluntary remand

7    and ordered that NMFS finish its reconsideration of SSL's supplemental petition and

8    New Zealand's request for a comparability finding by October 30, 2020.  (Supp. Pet. at 5;

9    Graff Decl. ¶ 18.)

10          In accordance with the CIT's order, SSL submitted a supplemental petition on

11   August 27, 2020, asking again for the immediate ban of all fish products originating from

12   fisheries endangering the Māui dolphin.  (*See* Supp. Pet.; Graff Decl. ¶ 20.)  NMFS again

13   rejected the petition on October 26, 2020, and issued its denial on November 9, 2020.

14   Notification of Rejection of Petition and Issuance of Comparability Findings, 85 Fed.

15   Reg. 71297-01, 71300 (Nov. 9, 2020).  It found that New Zealand had implemented a

16   regulatory program governing the bycatch of Māui dolphins that is comparable in

17   effectiveness to domestic standards, and thus, the fisheries at issue are authorized to

18   export products to the United States.  *Id.* at 71298.

19          To date, the Government has released over 1,000 documents in their entirety in

20   response to SSL's FOIA requests.  (*See* Graff Decl. ¶¶ 30-42.)  Additionally, the

21   Government has released over 400 partially redacted documents.  (*See id.*)  SSL moves

22   for the production of withheld documents.  (*See* MSJ; Graff Decl. ¶ 42.)

1

### III.   ANALYSIS

2  FOIA strives to "open[] up the workings of government to public scrutiny

3  through the disclosure of government records." *Stern v. Fed. Bureau of Investigations*,

4  737 F.2d 84, 88 (D.C. Cir. 1984)[3]; *see* 5 U.S.C. § 552.  However, Congress recognized

5  that "legitimate governmental and private interests could be harmed by release of certain

6  types of information." *Critical Mass Energy Project v. Nuclear Regul. Comm'n*, 975

7  F.2d 871, 872 (D.C. Cir. 1992).  As such, an agency may withhold information in nine

8  categories of records listed in § 552(b).  5 U.S.C. § 552(b).  Requested material must be

9  disclosed unless it falls squarely within one of those nine exemptions.  *Cameranesi v.*

10  *U.S. Dep't of Def.*, 856 F.3d 626, 637 (9th Cir. 2017).

11  Summary judgment is appropriate if the evidence, when viewed in the light most

12  favorable to the non-moving party, demonstrates there is no genuine issue of material

13  fact.  Fed. R. Civ. Pro. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

14  "Summary judgment is the procedural vehicle by which nearly all FOIA cases are

15  resolved."  *L.A. Times Commc'ns, LLC v. Dep't of the Army*, 442 F. Supp. 2d 880, 893

16  (C.D. Cal. 2006).  The court conducts a *de novo* review of an agency's response to a

17  FOIA request.  5 U.S.C. § 552(a)(4)(B); *U.S. Dep't of Just. v. Reps. Comm. for Freedom*

18  *of Press*, 489 U.S. 749, 755 (1989).  If there is a genuine issue of material fact, the court

19  //

20

21  [3] While the court is not bound by D.C. Circuit decisions, it recognizes that the D.C. Circuit has dealt with a large number of FOIA cases and thus, courts give "great deference" to its

22  analysis in this area of law.  *Advocs. for the W. v. U.S. Dep't of Just.*, 331 F. Supp. 3d 1150, 1160 (D. Idaho 2018).

1    should proceed to a bench trial or adversary hearing.  *Animal Legal Def. Fund v. U.S.*

2    *Food & Drug Admin.*, 836 F.3d 987, 990 (9th Cir. 2016).

3          Courts follow a two-step inquiry when presented with a motion for summary

4    judgment in a FOIA case.  *L.A. Times*, 442 F. Supp. 2d at 893.  First, courts must

5    evaluate "whether the agency has met its burden of proving that it fully discharged its

6    obligations under the FOIA."  *Id.*  To do so, the agency must demonstrate that it has

7    conducted a search reasonably calculated to uncover all relevant documents.  *Zemansky*

8    *v. U.S. Env't Prot. Agency*, 767 F.2d 569, 571 (9th Cir. 1985).  If the agency satisfies its

9    initial burden, the court must then determine "whether the agency has proven that the

10   information that it did not disclose falls within one of the nine FOIA exemptions."  *L.A.*

11   *Times*, 442 F. Supp. 2d at 894.  In meeting its burden, "the government may not rely

12   upon 'conclusory and generalized allegations of exemptions.'" *Church of Scientology of*

13   *Cal. v. U.S. Dep't of the Army*, 611 F.2d 738, 742 (9th Cir. 1980) (quoting *Vaughn v.*

14   *Rosen*, 484 F.2d 820, 826 (D.C. Cir. 1973)).

15          In its motion, SSL focuses on the second step concerning exemptions.  SSL

16   attached a *Vaughn* index[4] produced by the Government on November 4, 2020, listing 53

17   withheld or redacted records.  (Sommermeyer Decl. ¶ 7, Ex. 5 ("11/4/20 *Vaughn*

18   Index").)  Since that time, the Government has released more documents to SSL, and

19   *//*

20

21          [4] The *Vaughn* index takes its name from *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973),
     where the court required an agency to provide detailed support for its claimed exemptions.  *Id.* at
     826-28.  A *Vaughn* index has now become "the accepted 'privilege log'" in FOIA cases.
22   *Advocs. for the W.*, 331 F. Supp. 3d at 1159.

1    thus, there are 39 remaining records at issue concerning Exemptions 5 and 6.[5]  (*See* Graff

2    Decl. ¶ 42, Ex. D ("*Vaughn* Index").)  SSL first challenges the adequacy of the

3    Government's *Vaughn* index and then attacks the propriety of each exemption.  (MSJ at

4    6.)  Lastly, SSL argues that even if the redactions are "technically warranted," the

5    Government has not demonstrated the necessary foreseeable harm from disclosure and

6    that the redactions are "excessive."  (*Id.* at 1, 6.)  The court takes each argument in turn.

7    **A.    *Vaughn* Index**

8         Under FOIA, an agency must "notify the person making such request of [its]

9    determination and the reasons therefor."  5 U.S.C. § 552(a)(6)(A)(i)(I).  Many agencies

10   choose to do so through a *Vaughn* index.  While there is no "set formula" for a *Vaughn*

11   index, *Advocs. for the W.*, 331 F. Supp. 3d at 1160, agencies should "disclose as much

12   information as possible" without thwarting the purpose of the stated exemption, *Citizens*

13   *Comm'n on Hum. Rts. v. U.S. Food & Drug Admin.*, 45 F.3d 1325, 1328 (9th Cir. 1995).

14   SSL argues that the Government's *Vaughn* index is "plainly inadequate" because it "lacks

15   detail" and "relies on generalized boilerplate language."  (MSJ at 7.)  The court disagrees.

16        A *Vaughn* index must be specific enough such that the requester "can fairly

17   determine what has not been produced and why, and the court can decide whether the

18   exemptions claimed justify the nondisclosure."  *Fiduccia v. U.S. Dep't of Just.*, 185 F.3d

19   1035, 1160 (9th Cir. 1999).  The index must (1) identify each document withheld; (2)

20   state the statutory exemption claimed; and (3) explain how disclosure would damage the

21

22        [5] The Government is no longer claiming Exemption 7.  (Graff Decl. ¶¶ 40, 42.)  Thus,
     SSL's arguments regarding that exemption are moot.  (*See* MSJ at 11-19.)

1   interests protected by the claimed exemption.  *Citizens Comm'n*, 45 F.3d at 1326 n.1; *see*

2   *also King v. U.S. Dep't of Just.*, 830 F.2d 210, 223-24 (D.C. Cir. 1987) (requiring

3   *Vaughn* index to describe each document and discuss consequences of disclosure).

4   However, the agency is not required to produce a *Vaughn* index; it may rely on affidavits

5   alone.  *Advocs. for the W.*, 331 F. Supp. 3d at 1161.  If the affidavits "contain reasonably

6   detailed descriptions of the documents and allege facts sufficient to establish an

7   exemption, the district court need look no further."  *Lane v. Dep't of Interior*, 523 F.3d

8   1128, 1135-36 (9th Cir. 2008).

9        In *Advocates for the West*, the requestor mounted a similar attack on the

10  sufficiency of the *Vaughn* index, taking issue with its lack of specificity and "boilerplate"

11  descriptions.  331 F. Supp. 3d at 1160.  There, the *Vaughn* index included the date of the

12  record, the authors, a brief description of the record, and the claimed privilege.  *Id.* at

13  1159-60.  The brief descriptions were identical for several records.  *Id.* at 1159.

14  Nonetheless, the court found the *Vaughn* index to be adequate, noting that the index

15  along with the accompanying affidavit "included numerous details about the records [the

16  agency] seeks to withhold."  *Id.* at 1161.  Because the index had sufficient detail to

17  explain how the withheld information "logically falls within the claimed exemptions, and

18  [] that the justifications are not controverted by contrary evidence in the record or by

19  evidence of [] bad faith," the court concluded that the agency had provided enough to

20  "permit the adversarial process to function."  *Id.* at 1161-62 (quoting *Hunt v. Cent. Intel.*

21  *Agency*, 981 F.2d 1116, 1119 (9th Cir. 1992)) (internal quotation marks omitted).

22  //

ORDER - 9

1    The Government's information here is likewise sufficient.  Here, the Government

2    has provided both a *Vaughn* index and an accompanying declaration of Mr. Mark H.

3    Graff, the FOIA Officer for NOAA.[6]  (Graff Decl. ¶ 1; *see generally Vaughn* Index.)  The

4    *Vaughn* index includes the file name; the subject of the record; the sender or author; the

5    recipients; those cc'd on any communications; the date of the record; the claimed

6    exemption; and a "[r]ationale for [w]ithholding" that includes a brief description of each

7    document, the context in which it was made, what has been withheld from the document,

8    why it falls within the claimed exemption, and the interest that it seeks to protect.  (*See*

9    *Vaughn* Index.)  Mr. Graff in his declaration expounds on the *Vaughn* index for

10   individual documents.  (*See, e.g.*, Graff Decl. ¶ 55.)

11   This information satisfies all three requirements articulated by *Citizens*

12   *Commission.  See* 45 F.3d at 1326 n.1.  While some of the rationales are used for more

13   than one document, it is not unusual for descriptions or rationales to be similar when the

14   underlying documents are themselves similar.  *See Advocs. for the W.*, 331 F. Supp. 3d at

15   1161-62; *see also Citizens Comm'n*, 45 F.3d at 1328 (rejecting argument that *Vaughn*

16   index was inadequate due to "boilerplate" reasons for nondisclosure).  As in *Advocates*

17   *for the West*, the court finds sufficient detail in the Government's *Vaughn* index and

18   //

---

19   [6] SSL accuses the Government of "circumvent[ing] the page limits" of briefing by

20   including "more than ten pages of argument about why specific records are exempt" in a 20-page declaration.  (Reply (Dkt. # 46) at 2 n.2.)  The court finds it curious that SSL is demanding more detail about the rationale for withholding while simultaneously objecting to the Government's

21   provision of that detail.  Regardless, the Government may expound on its *Vaughn* index through declaration testimony.  *See Advocs. for the W.*, 331 F. Supp. 3d at 1161.  Thus, the court finds

22   SSL's concern overblown.

ORDER - 10

1  accompanying declaration to explain how the records logically fall within the claimed

2  exemptions.  *See* 331 F. Supp. 3d at 1162.  The Government's information allows SSL a

3  "meaningful opportunity to contest" and the court an "adequate foundation to review" the

4  withholdings.[7]  *See Citizens Comm'n*, 45 F.3d at 1328.

5       Because the court concludes that the *Vaughn* index is sufficient, it now proceeds to

6  examine the merits of the claimed exemptions.

7  **B.**     **Exemption 5 – Attorney-Client Privilege and Deliberative Process Privilege**

8       Exemption 5 authorizes the non-disclosure of "interagency or intra-agency

9  memorandums or letters which would not be available by law to a party other than

10  another agency in litigation with the agency."  5 U.S.C. § 552(b)(7).  Thus, an agency

11  may withhold a document if it is "normally privileged in the civil discovery context."

12  *Lahr v. Nat'l Transp. Safety Bd.*, 569 F.3d 964, 979 (9th Cir. 2009).  The Government has

13  claimed two privileges under Exemption 5—the attorney-client privilege and the

14  deliberative process privilege—to withhold portions or the entirety of 24 records.  (Graff

15  Decl. ¶ 42.)  The Government claims the deliberative process privilege for all 24

16  documents and additionally claims the attorney-client privilege for eight of those

17  documents.  (*Id.* ¶¶ 46, 59.)

18       At the outset, the court addresses the confusion over the attorney-client privilege.

19  In its motion, SSL did not challenge the Government's assertion of attorney-client

20  //

21  

22       [7] Because the court finds that the Government's *Vaughn* index and declaration provides
an adequate foundation for review, it declines to order an *in camera* review as SSL requests.
(*See* MSJ at 23-24); *see Favish v. Office of Indep. Couns.*, 217 F.3d 1168, 1174 (9th Cir. 2000).

1    privilege for redactions in eight documents,[8] focusing instead on only the deliberative

2    process privilege.  (*See, e.g.*, MSJ at 9 n.2 (challenging document 10527 for improper use

3    of deliberative process privilege, not attorney-client privilege).)  On reply, SSL contends

4    that "[a]fter nearly two years," the Government was claiming "for the very first time[]"

5    that eight records contain information protected from disclosure by the attorney-client

6    privilege."  (Reply at 9.)  But in the November 4, 2020, *Vaughn* index that SSL submits,

7    the Government plainly asserts attorney-client privilege for those eight records.

8    (*Compare* 11/4/20 *Vaughn* Index at 10527 (claiming "ACP and DPP" privileges for

9    document 10527), *with Vaughn* Index at 10527 (identical).)  As SSL challenges the

10   attorney-client privilege for the first time on reply, the court does not consider this

11   argument.  *See Bridgham-Morrison v. Nat'l Gen. Assembly Co.*, No. C15-0927RAJ, 2015

12   WL 12712762, at *2 (W.D. Wash. Nov. 16, 2015) ("For obvious reasons, new arguments

13   . . . presented for the first time on Reply . . . are generally waived or ignored.").

14   Accordingly, the court upholds the redactions in these eight documents, because even if

15   SSL prevails on its argument regarding the deliberative process privilege, those

16   redactions are still protected under the assertion of attorney-client privilege.

17        The remaining 16 documents implicate the deliberative process privilege only.

18   The deliberative process privilege shelters "the consultative functions of government by

19   //

---

20
21   [8] When identifying documents, the court uses the last digits of their ID number.  Because neither of the *Vaughn* indices contains page numbers, the court will cite to the document number when referring to a certain entry.  (*See* 11/4/20 *Vaughn* Index; *Vaughn* Index.)  There are eight documents claimed under both the attorney-client and the deliberative process privileges.  (*See Vaughn* Index at 10343.1, 10527, 10595, 10117.2, 10147.1, 10795, 10350, 10364.)

22

1    maintaining the confidentiality of advisory opinions, recommendations, and deliberations

2    comprising part of a process by which governmental decisions and policies are

3    formulated." *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*, 861 F.2d 1114, 1117 (9th Cir.

4    1988).  By shielding the "give-and-take that occurs among agency members in the

5    formulation of policy," the privilege "encourages frank and open discussion of ideas, and,

6    hence, improves the decision[-]making process." *Id.*  To fall within the deliberative

7    process privilege, the Government must show that the document is both pre-decisional

8    and deliberative. *Lahr*, 569 F.3d at 979.  SSL argues that the Government has shown

9    neither.  (MSJ at 7-8.)

10         1.  Pre-decisional

11         A document is pre-decisional if it was "prepared in order to assist an agency

12   decisionmaker in arriving at his decision." *Lahr*, 569 F.3d at 979 (quoting *Assembly of*

13   *Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 920 (9th Cir. 1992)).  Such documents

14   "may include recommendations, draft documents, proposals, suggestions, and other

15   subjective documents which reflect the personal opinions of the writer rather than the

16   policy of the agency." *Id.*  A pre-decisional document "must have been produced during

17   an identifiable decision[-]making process, even if the process did not culminate in a

18   decision." *Am. Civil Liberties Un. v. Dep't of Def.*, CV 18-154-M-DWM, 2019 WL

19   3945845, at *6 (D. Montana 2019).  Moreover, while the privilege usually applies to

20   documents that are prepared before the final decision, it can also extend to documents

21   prepared after a decision "with the goal of confirming or rejecting its earlier

22   //

ORDER - 13

1    conclusions." *Lahr*, 569 F.3d at 981.  However, the privilege does not protect documents

2    that "follow a final decision and are designed to explain a decision already made."  *Id.*

3         For a group of documents, SSL concedes that they are deliberative but challenge

4    whether they are pre-decisional.  (MSJ at 8-9.)  These documents fall into two categories:

5    (1) documents pertaining to an internal memorandum regarding the rejection of SSL's

6    petition ("Decision Memo"); and (2) documents pertaining to the subsequent Federal

7    Register notice announcing the rejection.  (*Id.* at 9.)  The court concludes that documents

8    in the former category are pre-decisional but that documents in the latter are not.

9                  i.   *Decision Memo Documents*

10        SSL questions whether four documents concerning a Decision Memo written for

11   NMFS leadership detailing the rejection of its petition are pre-decisional.  (MSJ at 9 n.2-3

12   (challenging documents 10283, 10329, 10283.1, and 10372.2).)  Two of the documents

13   are emails, dated June 17 and 18, 2019, with redacted edits to the Decision Memo.

14   (*Vaughn* Index at 10283, 10329; Graff Decl. ¶ 52, Ex. J; Sommermeyer Decl. ¶ 8, Ex. 6.)

15   The other two are drafts of that Decision Memo with staff comments redacted.  (*Vaughn*

16   Index at 10283.1, 10372.2; Graff Decl. ¶ 52, Exs. I, K.)  No dates are apparent from the

17   face of the drafts.  (*See id.*)

18        The Decision Memo at the center of these four records was written for NMFS

19   leadership presenting "the staff recommendation to reject [SSL's] petition" and "seeking

20   concurrence."  (Graff Decl. ¶¶ 52-53.)  The memo presents the relevant background,

21   consultations, a summary of New Zealand regulations, and the recommendation to reject

22   the petition.  (*Id.* ¶ 52, Exs. I, K.)  The Government represents that the Decision Memo

1    would "go before the agency's decisionmaker, the NMFS Administrator, to assist him in

2    making the agency's final determination on the petition." (*Id.* ¶ 53.)  Indeed, the memo

3    ends with a space for the NMFS Administrator to approve or reject the recommendation.

4    (*Id.* ¶ 52, Exs. I, K at 11.)  This description of the Decision Memo as part of the

5    decision-making process on SSL's petition is only bolstered by the fact that no document

6    was made after June 18, 2019, when the Government formally rejected the petition.

7    (Graff Decl. ¶ 47); Notification of the Rejection of the Petition to Ban Imports, 84 Fed.

8    Reg. 32853-01, 32853 (July 10, 2019).  Even if any of the documents were made after

9    June 18, 2019, the Decision Memo, and the work on it, was made with the goal of

10   confirming or rejecting a previous conclusion, which qualifies as pre-decisional. *See*

11   *Lahr*, 569 F.3d at 981.  Accordingly, the court finds sufficient evidence that the

12   documents involving the Decision Memo are pre-decisional to the rejection of SSL's

13   petition and thus are protected by the deliberative process privilege.

14        SSL suggests that the Government "clearly has misrepresented the date" of when

15   the petition was rejected and asks the court to disregard the Government's arguments as

16   "simply not credible." (Reply at 5.)  The court may not make credibility determinations

17   on summary judgment and further does not find that a genuine issue of fact exists to

18   warrant such a determination. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249-50

19   (1986).  While SSL is correct that conversations about the Federal Register notice's

20   publication date and drafts of the Decision Memo circulated before June 18, 2019, none

21   of those communications definitively establish that the decision had already been

22   finalized by the NMFS Administrator.  (*See* Graff Decl. ¶¶ 57, 52, Exs. T, J.)  For

1    example, the Decision Memo draft that SSL points to as having been signed on June 13,

2    2019, was not signed by the intended recipient—the NOAA Administrator—and the

3    space for him to adopt or reject the recommendation remained blank.  (*Id.* ¶ 52, Ex. I at 1,

4    13.)  The evidence cited by SSL is insufficient to disregard the "presumption of

5    legitimacy" afforded to the Government or to alter the court's conclusion that the

6    Decision Memo documents are pre-decisional.  *See Dep't of State v. Ray*, 502 U.S. 164,

7    169, 179 (1991).

8                    *ii.  Federal Register Notice*

9            The same cannot be said for the documents involving the Federal Register notice.

10   SSL challenges two email communications, dated June 4 and 27, 2019, discussing edits

11   to the notice for publication in the Federal Register.[9]  (*Vaughn* Index at 10521, 10784;

12   Graff Decl. ¶ 57, Exs. S, T.)  The Government portrays these documents as pre-decisional

13   to "the publication of the Federal Register notice announcing NMFS's decision on

14   [SSL's] petition, which occurred on July 10, 2019."  (Graff Decl. ¶ 57.)  But issues

15   following a final decision that are designed to explain that decision fall outside the

16   deliberative process privilege.  *Lahr*, 569 F.3d at 981; *see also Nat'l Wildlife Fed'n*, 861

17   F.2d at 1122 (declining to apply privilege to final opinions, statements of policy and

18   interpretation, or any other documents having force and effect of law).  Some courts

19   describe the key question as whether the materials "reflect deliberations about what

20   //

---

21      [9] SSL also challenged the redaction of draft Federal Register notices (MSJ at 9), but two
     of those documents are separately protected by the attorney-client privilege, *see supra* § III.B,
22   and one has since been produced in full, (Graff Decl. ¶ 28 n.2).

1    message should be delivered to the public about an *already-decided* policy decision."

2    *Stevens v. U.S. Dep't of Homeland Sec.*, No. 14 C 3305, 2020 WL 1701882, at *6 (N.D.

3    Ill. 2020) (quoting *New York v. U.S. Dep't of Com.*, 18-CV-2921 (JMF), 2018 WL

4    4853891, at *2 (S.D.N.Y. 2018)) (emphasis in original).

5         Here, the Federal Register notice followed the Government's already-decided

6    choice—made on June 18, 2019—to reject SSL's petition and served to "announce[]"

7    and explain that decision to the public.  *See* Notification of the Rejection of the Petition

8    to Ban Imports, 84 Fed. Reg. 32853-01, 32853 (July 10, 2019).  The emails concern

9    internal discussion over "how to present certain issues," such as what citations to include

10   in the notice and how to speed the publication along.  (Graff Decl. ¶ 57, Exs. S, T.)

11   Plainly, the decision to reject the petition had already been made, and these documents

12   concern how to package or present that decision without implicating new policy

13   decisions.  *See Stevens*, 2020 WL 1701882, at *6 (observing that privilege does not

14   protect communications over "how to spin a prior decision").  Moreover, the Government

15   identifies no other decision-making process that these records implicate.  (*See* Graff Decl.

16   ¶ 57.)  The Government has failed to show how the publication of the Federal Register

17   notice was anything more than a formal explanation of the previously-made decision to

18   reject the petition, and thus, the court concludes that the documents involving the Federal

19   Register notice are not protected by the deliberative process privilege.

20        Having determined that the documents implicating the Decision Memo are

21   pre-decisional and that those implicating the Federal Register notice are not, the court

22   turns now to the last remaining document:  a report generated by the agency's Google

1   Workspace on June 6, 2019, detailing edits and comments made by NMFS staff on both

2   the Decision Memo and the Federal Register notice.[10] (*Vaughn* Index at 10288; Graff

3   Decl. ¶ 53, Ex. L.) It is unclear which redactions pertain to which document, and thus the

4   court orders the Government to review document 10288 to produce any portions relating

5   to the Federal Register notice in accordance with the above reasoning.

6        2. <u>Deliberative</u>

7        In addition to being pre-decisional, a document must be deliberative to fall under

8   the deliberative process privilege. *Lahr*, 569 F.3d at 979. Material is deliberative if it

9   "bear[s] on the formulation or exercise of agency policy-oriented *judgment*." *Petroleum*

10   *Info. Corp. v. U.S. Dep't of Interior*, 976 F.2d 1429, 1435 (D.C. Cir. 1992) (emphasis in

11   original). Conversely, when the material "could not reasonably be said to reveal an

12   agency's or official's mode of formulating or exercising policy-implicating judgment, the

13   deliberative process privilege is inapplicable." *Id.* Examples of "deliberative" materials

14   include "recommendations, draft documents, proposals, suggestions, and other subjective

15   documents which reflect the personal opinions of the writer rather than the policy of the

16   agency or that inaccurately reflect or prematurely disclose the views of the agency."

17   *Sierra Club, Inc. v. U.S. Fish & Wildlife Serv.*, 925 F.3d 1000, 1015 (9th Cir. 2019)

18   (quoting *Nat'l Wildlife Fed'n*, 861 F.2d at 1118-19) (internal quotation marks omitted).

19   SSL argues that the Government improperly redacted factual instead of deliberative

20   *//*

21

22        [10] This document also features redactions based on Exemption 6, which the court addresses next. *See infra* § III.C. The court focuses only on the Exemption 5 redactions here.

1  information in:  (1) three internal memoranda; and (2) two sets of notes taken by staff

2  during a meeting with New Zealand officials.[11]  (MSJ at 10-11 n.6, 8.)

3      SSL is correct that generally, factual information is not deliberative and must be

4  disclosed.  *See Petroleum Info. Corp.*, 976 F.2d at 1434.  However, courts are cautioned

5  against "relying on a 'wooden' facts-versus-opinions dichotomy." *Sierra Club*, 925 F.3d

6  at 1015 (quoting *Assembly of Cal.*, 968 F.2d at 921).  Instead, courts apply a "functional

7  approach," which considers whether "the contents of the documents 'reveal the mental

8  processes of the decisionmakers' and would 'expose [the Government's]

9  decision-making process in such a way as to discourage candid discussion.'" *Id.*  Thus,

10  materials containing facts are not automatically ineligible for the deliberative process

11  privilege.  Pre-decisional materials, even if "factual" in form, may warrant exemption if

12  disclosure would reveal the agency's "evaluation and analysis of the multitudinous

13  facts"; "the disclosure of the manner of selecting or presenting facts would expose the

14  deliberative process"; or "the facts are 'inextricably intertwined' with 'policy-making

15  processes.'" *Nat'l Wildlife Fed'n*, 861 F.2d at 1118-19.  Exemption is particularly apt

16  when the material reflects the opinions of individual staff rather than the agency as a

17  whole.  *See Sierra Club*, 925 F.3d at 1016.

18      Accordingly, when materials containing facts nonetheless reflect an agency's

19  preliminary position or thoughts on a policy matter, they are protected by the deliberative

20  //

---

21      [11] SSL originally challenged two versions of a risk assessment memorandum that have
    since been released in full.  (*See* MSJ at 10 n.7 (challenging documents 10316.2 and 10695.3);
22  Graff Decl. ¶ 28 n.2 (identifying documents 10316.2 and 10695.3 as released).)

1    process privilege.  *Petroleum Info. Corp.*, 976 F.2d at 1435.  For example, staffers'

2    factual summary of evidence introduced at a hearing was exempt because "[e]ven if they

3    cited portions of [the factual] evidence verbatim," the staffers were "exercising their

4    judgment as to what record evidence would be important . . . [and] making an evaluation

5    of the relative significance of the facts recited in the record."  *Montrose Chem. Corp. of*

6    *Cal. v. Train*, 491 F.2d 63, 68 (D.C. Cir. 1974).  Likewise, drafts of and comments on

7    Forest Plans and Environmental Impact Statements were exempt because as a collection

8    of "tentative opinions and recommendations" of individual staff on "matters instrumental

9    to the formulation of policies," it revealed the "mental processes" that went into choosing

10   a final course of action.  *Nat'l Wildlife Fed'n*, 861 F.2d at 1121.  Thus, although the

11   material undoubtedly contained factual information, they were still "deliberative" in that

12   they revealed "editorial and policy judgment" of the agency.  *Id.* at 1122.

13   Applying this functional approach to the two categories of records at issue, the

14   court concludes that both are deliberative even though they may include factual

15   information.  First, SSL challenges three documents pertaining to an internal

16   memorandum written about the petition.[12]  (MSJ at 10 n.6.)  Two are drafts of an internal

17   memorandum written by NMFS staff to leadership about the status of consultations with

18   New Zealand as it relates to the petition and the comparability review.  (*Vaughn* Index at

19   10316.1, 10116.1; Graff Decl. ¶ 50, Exs. E, F.)  Both drafts contain a redacted chart

20   //

21   _____

[12] Two other documents have since been released.  (*See* MSJ at 10 n.6 (challenging documents 10168.1 and 10406.1); Graff Decl. ¶ 28 n.2 (identifying documents 10168.1 and 10406.1 as released).)

1    labeled "Options for Response to the Petition" with pros, cons, and other considerations

2    for each option.  (Graff Decl. ¶ 50, Exs. E, F at 2-3.)  The third document is a draft of

3    another internal memorandum with a redacted staff comment on the monitoring

4    component of New Zealand's regulatory program.  (*Id.* ¶ 51, Ex. G at 3.)

5         All three documents reveal the judgment of individual staff members as to what

6    factual evidence was important enough to present, their evaluation of that factual

7    evidence, and their own opinions on the evidence's significance.  Like the draft plans and

8    statements in *Nat'l Wildlife Fed'n*, the redacted chart in the internal memorandums and

9    the staffer's comment on the monitoring component contains the "tentative opinions and

10   recommendations" of individual staffers as they lay out their "mental processes" in

11   determining how to approach SSL's petition and the comparability review of New

12   Zealand's regulatory program.  *See* 861 F.2d at 1121.  Exposure of such

13   recommendations would discourage candid internal discussion among staff regarding

14   their evaluations of what options are available and which path to take.  As such, the court

15   concludes that these three documents are protected by the deliberative process privilege.

16        The same can be said about the two sets of notes captured by staff to summarize

17   meetings with New Zealand.  (*See* MSJ at 11 n.8; *Vaughn* Index at 10418.1, 10593.1;

18   Graff Decl. ¶¶ 55-56, Exs. Q, R.)  The authors of these notes are staff members on a team

19   responsible for drafting a recommendation on the comparability finding.  (Graff Decl.

20   ¶¶ 55-56.)  First, these notes reflect the opinion of individual staffers rather than the

21   position of the entire agency, which falls squarely in the understanding of "deliberative."

22   *See Sierra Club*, 925 F.3d at 1016.  Moreover, while the notes, like the factual summaries

1   in *Train*, undoubtedly capture some factual information, they also reveal what

2   information the staffer found important or relevant from the meeting, a winnowing

3   process that in itself unveils the staffer's mental processes as it relates to the

4   comparability finding.  *See* 491 F.2d at 68.  Indeed, the Government states that the facts

5   included in these notes "are inextricably intertwined with . . . impressions and opinions

6   on New Zealand's program and future options."  (Graff Decl. ¶¶ 55-56.)

7        In sum, as to the records withheld under Exemption 5, the court grants SSL's

8   motion for summary judgment for the records associated with preparing the Federal

9   Register notice.  The court orders production of those documents and further orders that

10  the Government review document 10288 to produce any portions relating to the Federal

11  Register notice.  For all remaining documents, the court concludes that the Government

12  has established that the redactions are pre-decisional and deliberative.  Accordingly, the

13  court denies SSL's motion for summary judgment for those remaining documents.

14  **C.    Exemption 6 – Clearly Unwarranted Invasion of Personal Privacy**

15       As a preliminary matter, the court clarifies which of the 19 documents claimed

16  under Exemption 6 is at issue, as not all the documents contain the information that SSL

17  seeks.  SSL pursues "the names and other identifying information (email addresses,

18  phone numbers, titles, etc.) of New Zealand government personnel."  (MSJ at 16.)  Thus,

19  SSL is not interested in and not challenging the redactions contained in seven documents

20  regarding personal cell phone numbers (*see* MSJ at 16 n.16; Graff Decl. ¶ 72; *Vaughn*

21  Index at 10437, 10439, 10444, 10795); information about individuals from other

22  //

1    countries (Graff Decl. ¶ 71; *Vaughn* Index at 10401); and active Google Drive links to

2    NMFS working documents (Graff Decl. ¶ 74; *Vaughn* Index at 10288, 10291).

3        Having identified the 12 remaining documents at issue,[13] the court now examines

4    whether Exemption 6 shields those documents.  Exemption 6 protects against disclosures

5    of "personnel and medical files and similar files [that] would constitute a clearly

6    unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(6).  This exemption

7    "protect[s] individuals from the injury and embarrassment that can result from the

8    unnecessary disclosure of personal information."  *U.S. Dep't of State v. Wash. Post Co.*,

9    456 U.S. 595, 599 (1982).  The inquiry necessarily requires the exercise of judgment, and

10   the court does so while mindful of the "strong presumption in favor of disclosure."

11   *Yonemoto v. Dep't of Veterans Affairs*, 686 F.3d 681, 694 (9th Cir. 2012), *overruled on*

12   *other grounds by Animal Legal Def. Fund*, 836 F.3d at 989-90.  SSL does not contest that

13   the redacted information are personnel, medical or similar files protected by Exemption

14   6.  (*See* MSJ at 16-19.)  Thus, the issue turns on whether disclosure of the names and

15   identifying information of the New Zealand officials would constitute a "clearly

16   unwarranted invasion of personal privacy."

17       Determining what is "clearly unwarranted" requires a "balancing of interests

18   between the protection of an individual's private affairs from unnecessary public

19   scrutiny, and the preservation of the public's right to governmental information."

20

21       [13] Four documents contain information about both New Zealand officials and agency
     conference line numbers and passcodes.  (Graff Decl. ¶ 75; *Vaughn* Index at 20036, 20036.1,

22   20039, 20039.1.)  For those documents, SSL is not seeking the work numbers and passcodes but
     is challenging the redactions relating to the New Zealand officials.  (*See* MSJ at 16-19.)

1    *Lepelletier v. Fed. Deposit Ins. Corp.*, 164 F.3d 37, 46 (D.C. Cir. 1999).  The Ninth

2    Circuit utilizes a two-step test for this balancing inquiry.  *Cameranesi*, 856 F.3d at 637.

3    First, courts evaluate the personal privacy interest at stake to ensure "that disclosure

4    implicates a personal privacy interest that is nontrivial or . . . more than [] de minimis."

5    *Id.* (quoting *Yonemoto*, 686 F.3d at 693) (internal quotation marks omitted).  Second, if

6    the agency establishes that the privacy interest is nontrivial, the burden shifts to the

7    requestor to show that "the public interest sought to be advanced is a significant one and

8    that the information [sought] is likely to advance that interest."  *Id.*  As a part of this

9    second step, courts balance the private interest against the public interest.  *Id.* (quoting

10   *Lane*, 523 F.3d at 1137) (internal quotation marks omitted).  The court concludes that the

11   Government has identified a nontrivial privacy interest and that this privacy interest

12   outweighs the public interest in disclosure.

13        1.  Privacy Interest

14        There must be "some nontrivial privacy interest in nondisclosure"; a showing that

15   "the interest is more than de minimis will suffice."  *Tuffly v. U.S. Dep't of Homeland

16   Sec.*, 870 F.3d 1086, 1092 (9th Cir. 2017).  The Ninth Circuit has stressed that the privacy

17   contemplated by Exemption 6 "is not some limited or cramped notion of that idea."

18   *Yonemoto*, 686 F.3d at 693.  Instead, personal privacy is implicated whenever the

19   disclosure constitutes a public intrusion into an individual's affairs, or it affects an

20   individual's control of personal information.  *Cameranesi*, 856 F.3d at 638.  Assurances

21   of confidentiality, while not necessary to trigger a cognizable privacy interest, can create

22   //

1    a justifiable expectation of privacy that bears on this evaluation.  *See id.* at 642; *Phillips*

2    *v. Immig. & Customs Enf't*, 385 F. Supp. 2d 296, 305 (S.D.N.Y. 2005).

3           Moreover, disclosures that would "subject individuals to possible embarrassment,

4    harassment, or the risk of mistreatment constitute nontrivial intrusions into privacy under

5    Exemption 6," including the "potential for harassment from third parties."  *Cameranesi*,

6    856 F.3d at 638-39.  Harassment in this context does not require "threatening or even

7    improper" conduct, only conduct that is unwanted.  *Carlson v. U.S. Postal Serv.*,

8    No. 15-cv-06055-JCS, 2017 WL 3581136, at *29 (N.D. Cal. Aug. 18, 2017).  In *Forest*

9    *Service Employees for Environmental Ethics v. U.S. Forest Service*, 524 F.3d 1021 (9th

10   Cir. 2008), government employees who were witnesses in a disaster investigation had

11   nontrivial privacy interests in the disclosure of their names because of the potential

12   harassment and unwanted solicitation from media, the requestor, or other members of the

13   public.  *Id.* at 1026.  Thus, an agency can carry its burden at the first step by establishing

14   that the requested disclosure has "[t]he potential" to result in the above sorts of

15   harassment.  *Cameranesi*, 856 F.3d at 639.

16          SSL argues that the Government's privacy concerns are "purely speculative."

17   (Reply at 11; MSJ at 18-19.)  The court disagrees for two reasons.  First, the Government

18   reports that the New Zealand government requested that personal information be redacted

19   to comply with New Zealand privacy laws, which discourages the disclosure of personal

20   information overseas.  (Graff Decl. ¶ 70; Resp. at 20 n.9.)  While SSL is correct that a

21   foreign government's privacy laws may not necessarily trump FOIA (*see* Reply at 11),

22   New Zealand's protection of their officials' identities is a strong indication that disclosure

1    would constitute an unwanted public intrusion into their personal affairs.  New Zealand's

2    privacy laws are analogous to assurances of confidentiality:  While not dispositive, it

3    creates a justifiable expectation of privacy on the parts of these foreign officials that is a

4    significant factor in evaluating their privacy interests.  *See Phillips*, 385 F. Supp. 2d at

5    304-05.  Disclosing their names or other identifying information may not only violate

6    New Zealand law but also greatly impact how those individuals control their personal

7    information.  *See Cameranesi*, 856 F.3d at 638.

8            Second, the potential here for harassment, as defined in the Exemption 6 context,

9    constitutes a nontrivial intrusion into privacy.  SSL downplays any threat to privacy as a

10   "mere possibility" (Reply at 10), but its own briefing reveals that SSL desires

11   identification of these foreign officials to obtain even more personal information, such as

12   their financial interests, political positions, and professional or educational background.

13   (*See* MSJ at 17-18.)  Thus, it is clear that SSL intends to dig even further into these

14   individuals' lives upon disclosure.  Such conduct is plainly unwanted, as New Zealand

15   has requested that the identities be redacted, and it qualifies as the potential harassment

16   that Exemption 6 guards against.  *See Forest Serv. Emps.*, 524 F.3d at 1026.  The fact that

17   the Māui dolphin's plight is public news—as demonstrated by SSL's petitions and

18   lawsuits on the matter—only increases the potential for harassment, embarrassment, or

19   unwanted solicitation from the media or other members of the public.  *See Carlson*, 2017

20   WL 3581136, at *29 (recognizing that public attention may increase shame or

21   embarrassment from disclosure).

22   //

1    Considering the entirety of the circumstances here, the court holds that the

2    Government has carried its burden of establishing a nontrivial privacy interest.

3    Accordingly, the court proceeds to the second step of balancing the identified privacy

4    interest against the public interest favoring disclosure.

5    2.    Balancing Private Interest Against Public Interest

6    When evaluating the public interest in disclosure, courts consider whether the

7    public interest is "significant" and whether the requested information "is likely to

8    advance that interest." *Cameranesi*, 856 F.3d at 639.  In considering significance, the

9    only relevant public interest is "the extent to which disclosure . . . would she[d] light on

10   an agency's performance of its statutory duties." *Yonemoto*, 686 F.3d at 694; *see also*

11   *Lepelletier*, 164 F.3d at 47 (requiring that disclosure allow public to learn something

12   directly about workings of agency)).  "[I]nformation about private citizens that is

13   accumulated in various governmental files but that reveals little or nothing about an

14   agency's own conduct is not the type of information to which FOIA permits access."

15   *Forest Serv. Emps.*, 524 F.3d at 1025.  Courts additionally consider whether the requested

16   information would "add significantly to the already available information concerning the

17   manner in which [the agency] performed its statutory duties." *Cameranesi*, 856 F.3d at

18   640.  If the requested information would not shed additional light, or if the requestor is

19   merely seeking the information to "conduct its own investigation," the "marginal

20   additional usefulness of such information" does not outweigh a nontrivial privacy

21   interest. *Id.*; *Forest Serv. Emps.*, 524 F.3d at 1027.

22   //

ORDER - 27

1    SSL maintains that disclosing the identities of the New Zealand officials would

2  shed light on whether these individuals were qualified to have consulted on the petition

3  and the subsequent comparability finding.  (MSJ at 17-18.)  But tellingly, SSL's listed

4  interests implicate only those officials—focusing on their expertise, conflicts of interest,

5  or whether they were "under political pressure"—not on the substance of their reports or

6  anything else they contributed to the Government.  (*See id.*)  While these individuals'

7  qualifications are undoubtedly relevant, it is only tangentially so, especially when the

8  Government already has a comparability finding process that evaluates information

9  presented by foreign nations.[14]  In that sense, SSL's intent to vet the New Zealand

10  officials is akin to the requestor's intent in *Forest Service Employees* to "conduct its own

11  investigation."  *See* 524 F.3d at 1027.  *Forest Service Employees* concluded that such

12  intentions would not "contribut[e] significantly to public understanding of the operations

13  or activities of the government."  *Id.* at 1024-25.  The court concludes the same here:

14  The "marginal additional usefulness" of the New Zealand officials' identities would not

15  add significantly to the public's understanding of the Government's handling of the

16  petition or the comparability finding.  *See id.*

17    Absent a showing of a significant public interest that is likely to be advanced by

18  the requested information, "the invasion of privacy is unwarranted, and the information is

19  properly withheld."  *Tuffly*, 870 F.3d at 1093; *see Graff v. Fed. Bureau of Investigations*,

20

---

21    [14] To the extent SSL is suggesting the Government acted "negligently or otherwise improperly" by not vetting these New Zealand officials, SSL has not produced the necessary evidence to overcome the "presumption of legitimacy" afforded to the Government.  *See Ray*,

22  502 U.S. at 169, 179.

ORDER - 28

822 F. Supp. 2d 23, 34 (D.D.C. 2011) ("[E]ven a weak privacy interest will always outweigh a lack of public interest.").  Here, SSL has not established that how the identities of the New Zealand officials would help the public learn anything about the Government, or how it would add "significantly" to what is already available.  *See Cameranesi*, 856 F.3d at 640.  And even if there is some incremental value stemming from disclosure of these identities, that public interest does not outweigh the risk of harm to the privacy interests.  Thus, the court concludes that disclosure of the identifying information would constitute a "clearly unwarranted" invasion of privacy.

The evidence here distinguishes this case from those that SSL relies upon, where the balancing of interests tipped towards disclosure.  (*See* MSJ at 18-19.)  For example, the agency in *Story of Stuff Project v. U.S. Forest Service*, 345 F. Supp. 3d 79 (D.D.C. 2018), offered only a conclusionary statement about the individuals' privacy interests without any context or further information about why disclosure would invade their privacy.[15]  *Id.* at 97-98.  Here, the Government has provided the necessary context—that the New Zealand officials operate under an expectation of privacy, as granted to them under their laws, and thus, New Zealand has requested that the disclosure not occur to avoid that invasion of their privacy.  (Graff Decl. ¶ 70.)  In *Adelante Alabama Workers Center v. U.S. Department of Homeland Security*, 376 F. Supp. 3d 345 (S.D.N.Y. 2019), Exemption 6 did not shield the identities and backgrounds of experts who were

//

---

[15] SSL mistakenly asserts that *Story of Stuff Project* "ordered disclosure of [the] names" at issue.  (*See* MSJ at 18.)  The court there found a genuine issue of material fact but did not order disclosure.  *Story of Stuff Project*, 345 F. Supp. 3d at 98.

1    contracted by the agency to investigate violations of civil rights, a responsibility normally

2    for the agency. *Id.* at 368.  Because the agency "contracted out part of its responsibility

3    . . . the public has a real interest in understanding whose judgment is being employed."

4    *Id.*  The New Zealand officials play a different role.  They are merely providing

5    information that the Government then evaluates to carry out its responsibility of deciding

6    whether emergency rulemaking or a comparability finding is appropriate.  Thus, the

7    public interest is considerably lower here than in *Adelante*.

8         In sum, the court concludes that disclosing the names and other identifying

9    information of the New Zealand officials would constitute a "clearly unwarranted"

10   invasion of privacy.  Accordingly, the court denies SSL's motion for summary judgment

11   on the Exemption 6 records.  Having addressed the exemption-specific arguments, the

12   court now turns to the arguments that apply even if the redactions are properly exempted.

13   **D.    Foreseeable Harm**

14        In 2016, Congress amended the FOIA to add a "foreseeable harm" requirement,

15   which allows withholding of information "only if the agency reasonably foresees that

16   disclosure would harm an interest protected by an exemption" or the "disclosure is

17   prohibited by law."  5 U.S.C. § 552(a)(8)(A)(i).  In other words, even if an exemption

18   applies, an agency still must release the record if the disclosure would not reasonably

19   harm an exemption-protected interest and is not prohibited by law.  *See id.*  This showing

20   of foreseeable harm is "an independent and meaningful burden on agencies."  *Nat. Res.*

21   *Def. Council v. U.S. Envtl. Prot. Agency*, No. 17-CV-5928, 2019 WL 3338266, at \*1

22   //

1  (S.D.N.Y. July 25, 2019).  SSL argues that the Government has failed to make that

2  showing here.  (MSJ at 19-21.)

3        Authority on how much detail satisfies the "foreseeable harm" requirement

4  remains scant.  *See Rosenberg v. U.S. Dep't of Def.*, 342 F. Supp. 3d 62, 77 (D.D.C.

5  2018) ("[S]urprisingly little authority—precedential or persuasive—on this issue

6  exists.").  The Ninth Circuit has not addressed the issue, and many courts recite the

7  standard with no occasion to analyze or apply it to the agency's articulation of harm.  *See,*

8  *e.g.*, *Transgender Law Ctr. v. U.S. Immig. & Customs Enf't*, No. 19-cv-03032-SK, 2020

9  WL 7382113, at *6 (N.D. Cal. Nov. 24, 2020).  However, the current consensus is that

10  the agency must do more than make a general assertion for all withheld documents.  For

11  example, in the context of Exemption 5, "general references to a chilling effect or other

12  boilerplate language regarding the effect on internal deliberation is insufficient."[16]

13  *Buffalo Field Campaign v. U.S. Dep't of the Interior, Nat'l Park Serv.*, CV 19-165-M-

14  DWM, 2020 WL 3790725, at *5 (D. Mont. July 7, 2020).  Instead, the agency should

15  provide "[c]ontext or insight into the specific decision-making processes or deliberations

16  at issue, and how they in particular would be harmed by disclosure."  *S. Environ. Law Ctr*

17  *v. Council on Environ. Quality*, --- F. Supp. 3d ----, No. 3:18CV00113, 2020 WL

18  7331996, at *3 (W.D. Va. Dec. 14, 2020).  The agency may take a "categorical approach"

19

20        [16] The parties did not provide any case law applying the "foreseeable harm" standard to
documents withheld under Exemption 6.  (*See* MSJ 19-21; Resp. at 17 n.8; Reply at 2 n.1); *see*
21  *Rosenberg*, 342 F. Supp. 3d at 77-79, 90-93 (applying "foreseeable harm" analysis to Exemption
5 but not Exemption 6).  Because the standard applies to all exemptions "under which
discretionary disclosures can made," the court evaluates documents withheld under Exemption 6
22  as well.  (*See* MSJ at 20 (challenging documents withheld under both exemptions).)

1    by grouping similar documents together but must then explain the foreseeable harm for

2    each category.  *Rosenberg*, 342 F. Supp. 3d at 78.

3         In *Machado Amadis v. U.S. Department of State*, 971 F.3d 364 (D.C. Cir. 2020),

4    the D.C. Circuit—the only circuit court to have considered this issue—held that the

5    agency reasonably foresaw that disclosure would harm an interest protected by the

6    deliberative-process privilege.  *Id.* at 371.  After reviewing the purpose behind the

7    privilege of protecting "debate and candid consideration of alternatives," the D.C. Circuit

8    stated that the agency's affidavit "adequately explained that full disclosure . . . would

9    discourage [staff] from 'candidly discuss[ing] their ideas, strategies, and

10   recommendations,' thus impairing 'the forthright internal discussions necessary for

11   efficient and proper adjudication of administrative appeals.'"  *Id.* (quoting agency

12   affidavit).  The requestor argued, like SSL does here, that the agency could not rely on

13   "generalized" assertions, but the D.C. Circuit held that the agency met the "foreseeable

14   harm" requirement by "focus[ing] on 'the information at issue' . . . and conclud[ing] that

15   disclosure of that information 'would' chill future internal discussions."  *Id.* (quoting

16   agency affidavit); *see also Buffalo Field Campaign*, 2020 WL 3790725, *6 (finding

17   agency description of how employees would be "reluctant to provide preliminary

18   information, or to commit such information into writing" sufficient).

19        In contrast, *Rosenberg v. U.S. Department of Defense* considered the agency's

20   general representation that the withheld information would "jeopardize the free exchange

21   of information."  342 F. Supp. 3d at 77-79.  The court found this general statement

22   insufficient, especially when the withheld discussions "[ran] the gamut" from

1   "performance of personnel" to "appropriate next steps related to detainees' mental,

2   physical, and emotional health." *Id.* at 78.  The court saw how some categories—such as

3   opening a new detention operation—could result in reasonably foreseeable harm to future

4   "honest and frank" communication, but without more detail, it struggled to see how other

5   "seemingly more benign" categories of deliberative information—such as communication

6   about maintenance issues—would result in the same level of harm.  *Id.* at 79.

7          SSL broadly challenges the redactions under Exemptions 5 and 6 as deficient.

8   (*See* MSJ at 20-21.)  The court disagrees.  As to Exemption 5, the Government, like the

9   agency in *Machado Amadis*, delves into the redacted information and explains how

10  disclosure of that information would impact future internal discussions.  *See* 971 F.3d at

11  371.  For example, regarding the Decision Memo, the Government notes that the release

12  of discussions about "the merits of [SSL's] arguments" and "draft scientific analysis on

13  the pros and cons and special considerations of New Zealand's management program"

14  would "discourag[e] a frank and open dialogue among agency employees during the

15  formulation of briefing materials for agency leadership" and "cause confusion to the

16  public because this information contains opinions of individuals, but not those of the

17  agency itself."  (Graff Decl. ¶ 50.)  As to emails from "scientists at the NMFS Southwest

18  Fisheries Science Center" that discussed their "analysis of New Zealand's draft risk

19  assessment," the Government withheld "deliberations of the specific items the NMFS

20  scientists will need to include in their analysis of the draft risk assessment and the

21  analysis of the plan itself."  (*Id.* ¶ 54.)  Disclosure of such information would chill

22  dialogue "during the formulation of scientific analysis of fishery management programs."

1    (*Id.*)  For the staffers' draft notes during meetings with New Zealand, the Government

2    puts forth that the withheld material "do not represent the agency's views of what

3    occurred at the meeting" and "have not been reviewed by other agency staff for

4    accuracy."  (*Id.* ¶ 55.)  Moreover, release of these notes would hinder "staff's ability and

5    confidence in taking notes to remind themselves of events that occurred during meetings

6    held as a normal course of agency business."  (*Id.*)  Such justifications offer much more

7    than the generalized statement of "jeopardiz[ing] the free exchange of information" in

8    *Rosenberg*.  *See* 342 F. Supp. 3d at 77.  They adequately explain how the specific

9    withheld information would reasonably chill future internal discussions.

10         The same holds true for information withheld under the attorney-client privilege.

11   The Government describes the contents of what is withheld (Graff Decl. ¶¶ 60-64) and

12   explains that release would discourage "the open and frank communication between

13   counsel and client in NOAA's administration of the APA and the MMPA, including

14   preparation for litigation," (*id.* ¶ 66).  This chilling effect could "hinder[] the attorneys'

15   ability to perform their jobs."  (*Id.*)  Moreover, release of the communications with

16   attorneys "could waive the privilege on the subject matter."  (*Id.*)  Accordingly, after

17   review of the Government's declaration, *Vaughn* index and redacted documents, the court

18   is satisfied that the Government adequately foresaw that disclosure would harm interests

19   protected by both privileges under Exemption 5.

20         The court concludes the same for the information withheld under Exemption 6.

21   As discussed when evaluating the privacy interest, the Government adequately articulated

22   how disclosure of the names and identifying information of New Zealand officials would

1  be an unwanted invasion of their personal privacy.  *See supra* § III.C.1.  For example, not

2  only has New Zealand requested that the information be withheld under their privacy

3  laws, but the Government has also explained how release of the personal information

4  "could expose the owner of the [information] to harassment."  (Graff Decl. ¶¶ 70, 73.)

5  For the Google Drive links, the Government asserts that these links redirect to where

6  "documents are stored in their draft forms," which should "remain free from intrusion by

7  non-invited individuals."  (*Id.* ¶ 74.)  As to the New Zealand work conference lines, the

8  Government explains how the lines are regularly used by New Zealand officials who

9  "have an expectation that their use of these lines will remain between the agency staff

10  and its invited users."  (*Id.* ¶ 75.)  Accordingly, the court holds that the Government has

11  focused on the identifying information at issue and explained how disclosure of that

12  information may invade the privacy interests protected by Exemption 6.

13       In short, the court concludes that the Government has justified its withholdings

14  under Exemptions 5 and 6 by adequately showing that disclosure would reasonably harm

15  the interests protected by the two exemptions.  The court denies SSL's motion for

16  summary judgment on this ground.

17  **E.    Segregability**

18       Lastly, SSL argues that the Government did not properly segregate and release

19  non-exempt material from exempt material.  (MSJ at 21-23.)  FOIA requires that any

20  "reasonably segregable portion of a record shall be provided to any person requesting

21  such record after deletion of the portions which are exempt."  5 U.S.C. § 552(b).  Thus,

22  even after a court finds that an agency's withholdings are proper, it must "make a specific

1  finding that no information contained in each document or substantial portion of a

2  document withheld is segregable." *Hamdan v. U.S. Dep't of Just.*, 797 F.3d 759, 779

3  (9th Cir. 2015).  However, the court does not need to "take on the role of a document

4  clerk, reviewing each and every document an agency withholds."  *Id.*  It may rely on an

5  agency's sufficiently detailed declaration, which are "presumed to be made in good faith

6  and may be taken at face value."  *Id.*

7          In *Hamdan*, the Ninth Circuit approved of agency declarations that "identify the

8  withheld documents individually"; "provide an individualized explanation of the material

9  being withheld"; and explicitly state that the withheld portions "are so inextricably

10  intertwined with the non-exemption portion" that segregation is not possible or that "[n]o

11  reasonably segregable, nonexempt portions were withheld."  *Id.* at 780 (quoting agency

12  affidavits).  The Ninth Circuit also recognized that re-reviewing materials for release and

13  "closely scrutinizing" what it released constitute evidence that the agency acted in good

14  faith, which further supports that the agency's affidavits can be taken at face value.  *Id.*

15          The Government has complied with its obligations to establish that all reasonably

16  segregable portions of the documents have been disclosed.[17]  Mr. Graff, who has personal

17  knowledge of SSL's requests as the FOIA Officer for NOAA, describes the withheld

18  information in sufficient detail such that the court can take it at face value.  (*See* Graff

19  //

20  _____

21  [17] The court notes that most of the documents identified by SSL as excessively redacted
   have now been released in full.  (*See* MSJ at 22 n.21-24; Graff Decl. ¶ 28.)  However, because it
   is reversible error for the district court to approve the withholding of any document without a

22  segregability finding, the court nonetheless reviews all remaining documents the Government is
   withholding.  *See Hamdan*, 797 F.3d at 779.

Decl. ¶¶ 1-2.)  The declaration describes the withheld documents individually and

provides detailed explanations for each withholding.  (*See, e.g.*, *id.* ¶ 50.)  For certain

files, it notes that the facts "are inextricably intertwined with deliberative material."  (*See,*

*e.g.*, *id.* ¶ 56.)  Furthermore, the Government reviewed each responsive record "on a page

by page and line by line basis to identify reasonably segregable, non-exempt

information" and each redacted or partially withheld record "individually to identify

non-exempt information . . . and implemented segregation where possible."  (*Id.*

¶¶ 76-77.)  The Government represents that "there is no further reasonably segregable

information to be released and all segregable information has been released."  (*Id.* ¶ 78.)

There is also evidence that the Government acted in good faith while reviewing

SSL's requests.  The Government re-reviewed the records at issue several times and

released additional documents, even after the filing of the instant motion.[18]  (*Id.*

¶¶ 30-40.)  It has scrutinized its redacted records, releasing documents even when only a

few lines were segregable and thus left unredacted.  (*E.g.*, *id.* ¶ 56, Ex. R (document

10593.1).)  Like the agency in *Hamdan*, "[r]ather than withhold the entire document," the

Government "took the correct view that it was required to release any information that

was not classified, even if it was a single sentence."  *See* 797 F.3d at 780.

Thus, based on the Government's declaration and the court's review of the

redacted documents, the court finds that the Government has segregated and disclosed all

---

[18] SSL laments in its reply about how the Government "abruptly abandoned their reliance on Exemption 7."  (Reply at 1-2.)  But like the Ninth Circuit in *Hamdan*, the court views the Government's release of additional records as an indication of good faith effort to fully comply with the requests.  *See* 797 F.3d at 780.

reasonably segregable portions of its withheld documents.  Accordingly, the court denies SSL's motion for summary judgment on the ground of segregability.

### IV.   CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part SSL's motion for summary judgment (Dkt. # 43).  Specifically, the court:

(1) ORDERS the Government to disclose documents 10521 and 10784 in their entirety; and

(2) ORDERS the Government to review document 10288 and disclose the portions pertaining to the Federal Register notice.

The court DENIES the remainder of SSL's motion.

Dated this 2nd day of February, 2021.

JAMES L. ROBART
United States District Judge